**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
            *Plaintiff-Appellee,*

v.

RONALD RAY DIAZ,
            *Defendant-Appellant.*

No. 06-30029

D.C. No.
CR-05-00034-BLW

OPINION

Appeal from the United States District Court
for the District of Idaho
B. Lynn Winmill, Chief District Judge, Presiding

Argued and Submitted
December 5, 2006—Portland, Oregon

Filed June 22, 2007

Before: Jerome Farris, Richard R. Clifton, and
Carlos T. Bea, Circuit Judges.

Opinion by Judge Clifton

## COUNSEL

Nicolas V. Vieth, Federal Defenders of Eastern Washington and Idaho, Pocatello, Idaho, for the appellant.

Thomas E. Moss, United States Attorney; Alan G. Burrow, Assistant United States Attorney (briefed and argued), Boise, Idaho, for the appellee.

# OPINION

CLIFTON, Circuit Judge:

Government agents had a valid warrant to arrest Ronald Ray Diaz. They went to his house to arrest him, thinking he was home one weekday afternoon, as he had been in the past. When he didn't respond they broke through the door and entered the house on their own, but Diaz wasn't there and neither was anybody else. Inside the house, the agents discovered incriminating evidence. That evidence became the subject of a motion to suppress, denied by the district court, now before us on appeal.

The question we must consider is whether the agents, who had an arrest warrant but no search warrant at the time they entered the house and first spotted the evidence, had sufficient reason to believe Diaz was home to justify the entry.[1] If not, then they violated the Fourth Amendment by entering the house, and the evidence discovered in the subsequent search was inadmissible against Diaz.

The district court ruled that the agents had sufficient reason to believe Diaz was at home and therefore did not violate his constitutional rights when they entered. We agree and affirm the district court's denial of Diaz's motion to suppress.

## I.   Background

Diaz lived on the Fort Hall Indian Reservation in Idaho. He had previously been convicted of assault, battery with intent to commit rape, and failure to register as a sex offender. He worked from home as a mechanic and often had several cars at the house. He protected his property with dogs and security cameras.

---

[1]We address other issues that Diaz raised in a separately filed memorandum disposition.

In July 2003, police visited Diaz's home and asked to look around. Diaz consented. In Diaz's bedroom the police discovered an assault rifle and a "snort tube" used to inhale methamphetamine. Police also found a bong and marijuana rolling papers in Diaz's kitchen. The snort tube and bong both tested positive for traces of methamphetamine.

The police went back to the house three or four more times over the next 18 months. Diaz usually answered the door, though once he took about 45 minutes to do so. Other people and many cars, including Diaz's own black sport utility vehicle, were usually there, though Diaz was sometimes there when his car was not. Diaz told the officers they could usually find him at his house during the day, and in fact they usually did. Between July 2003 and January 2005, Diaz was absent only once when the officers went to his house.

On February 23, 2005, a grand jury charged Diaz with (1) being a drug user in possession of a firearm in violation of 18 U.S.C. § 922(g)(3), and (2) being a convicted felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). A warrant was issued for Diaz's arrest. That afternoon, officers from several government agencies converged on Diaz's house. Before knocking on the door, the agents tried to survey the house for some sign Diaz was there. Barking dogs and security cameras impeded their efforts, so the officers resorted to driving by the house a few times. On one of those passes, an agent saw two unidentified people standing next to a red SUV. Diaz's black SUV was not in sight. Officers would later discover it in a nearby shed.

The agents surrounded the Diaz property. Within a few minutes, the red SUV drove away. The agents did not stop it. They did not identify who was driving and thought only one person was inside the vehicle; they surmised that the other person was still in Diaz's house.

After an hour and a half, the agents approached Diaz's house. They could not see inside because blankets covered the

windows. The agents knocked on the door, announced their presence, and waited a reasonable time. No one answered. The agents used force on the door and entered.

Inside, they found no one, but one agent saw a plastic baggie, containing what appeared to be illegal drugs, in Diaz's bedroom. The agents left the house, obtained a search warrant, and went back inside. In the subsequent search they seized a bag of methamphetamine and some drug equipment.

After discovering Diaz was not at home, the agents checked a nearby casino. They found Diaz there with his wife, Jamie, and arrested him.

Diaz filed a motion to suppress the evidence found during the February 2005 search. He argued that the agents exceeded the authority of their arrest warrant by entering his home when they had no reason to believe he was there. The district court denied Diaz's motion after hearing testimony from government agents, Jamie Diaz, and Diaz himself. The court concluded that the agents had enough experience with Diaz to reasonably conclude that he was home, and that the presence of dogs, cameras, and blankets made it impossible for them to conclude he was not at home.

A jury eventually convicted Diaz on both counts. Diaz appealed, arguing that the district court erred in allowing the government to introduce evidence from the February 2005 search.

II. Discussion

We review *de novo* the district court's denial of Diaz's motion to suppress. *See United States v. Decoud*, 456 F.3d 996, 1007 (9th Cir. 2006); *United States v. Adjani*, 452 F.3d 1140, 1143 (9th Cir. 2006). We review the district court's factual findings for clear error. *United States v. Howard*, 447

F.3d 1257, 1262 n.4 (9th Cir. 2006); *United States v. Thomas*, 447 F.3d 1191, 1196 n.7 (9th Cir. 2006).

### A. The "reason to believe" standard

[1] An arrest warrant gives government agents limited authority to enter a suspect's home to arrest him if they have "reason to believe" he is inside. *Payton v. New York*, 445 U.S. 573, 603 (1980). The phrase "reason to believe" is interchangeable with and conceptually identical to the phrases "reasonable belief" and "reasonable grounds for believing," which frequently appear in our cases. *See United States v. Gorman*, 314 F.3d 1105, 1111 n.4 (9th Cir. 2002) (listing examples of the three phrases' use and noting their identical meaning). The question of what constitutes an adequate "reason to believe" has given difficulty to many courts, including the district court in the present case.[2] The Supreme Court did not elaborate on the meaning of "reason to believe" in *Payton* and has not done so since then.

[2] We have not often discussed the issue of what constitutes a reason to believe a suspect is home, such that officers may enter his home to arrest him. *See, e.g., Gorman*, 314 F.3d at 1110-15; *Case v. Kitsap Cty. Sheriff's Dept.*, 249 F.3d 921, 930-31 (9th Cir. 2001); *United States v. Litteral*, 910 F.2d 547, 553-54 (9th Cir. 1990).[3] In *Gorman*, we held that to

---

[2]During the hearing on Diaz's motion to suppress, the district court encouraged an appeal because "the standard is uncertain and it would be of great help perhaps to the trial courts if there were some sort of — if there was some further development in this area."

[3]Several "reason to believe" cases discuss whether the police have reason to believe that the home they are entering is actually the suspect's home, which obviates the need for a search warrant. *See, e.g., Steagald v. United States*, 451 U.S. 204, 211-17 (1981); *Watts v. County of Sacramento*, 256 F.3d 886, 889-90 (9th Cir. 2001); *United States v. Underwood*, 717 F.2d 482, 483-87 (9th Cir. 1983) (en banc). Since Diaz does not argue that police had no reason to believe his home actually was his home, these cases are pertinent to the present case only insofar as they discuss the concept of reasonable belief.

decide whether police have reason to believe a suspect is at a particular place, a court must use "the same standard of reasonableness inherent in probable cause." 314 F.3d at 1112.

[3] The Supreme Court described the standard of reasonableness inherent in probable cause in *Brinegar v. United States*, 338 U.S. 160, 175-76 (1949): "Probable cause exists where 'the facts and circumstances within their (the officers') knowledge and of which they had reasonably trustworthy information (are) sufficient in themselves to warrant a man of reasonable caution in the belief that' an offense has been or is being committed." *Id.* (quoting *Carroll v. United States*, 267 U.S. 132, 162 (1925)) (parentheses in original). In this inquiry, common sense is key. In deciding whether there is probable cause to issue a search warrant, a judicial officer must weigh "the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Brinegar,* 338 U.S. at 175. In a modern take on these core concepts, we have held that probable cause means a " 'fair probability that contraband or evidence of a crime will be found in a particular place,' based on the totality of circumstances." *Dawson v. City of Seattle*, 435 F.3d 1054, 1062 (9th Cir. 2006), quoting *Illinois v. Gates*, 452 U.S. 213, 238 (1983).

[4] In *Gorman*, we held that this standard of reasonableness must apply in the reason-to-believe setting. A common-sense analysis of the "totality of the circumstances" is therefore crucial in deciding whether an officer has a reason to believe a suspect is home. *See, e.g., United States v. Magluta*, 44 F.3d 1530, 1535 (11th Cir. 1995) (in evaluating reasonable belief, courts must be "sensitive to common sense factors indicating a resident's presence").

*B.  Application to Diaz's case*

[5] The district court found that government agents had enough information to reasonably believe Diaz was home

when they entered his house on February 23, 2005. We agree. Diaz himself had told government agents that he was usually home during the day. Agents also knew that Diaz worked at home as a mechanic. Agents had visited Diaz's home several times before, and he was absent only one of those times. All of this information suggests that Diaz, on an ordinary day, would be home during daylight hours, which is when the agents came to arrest him.

[6] Even so, Diaz argues that on the day of his arrest, agents could not have reasonably believed he was home because there were too many clues that he was gone. We disagree. At most, there were some signs that Diaz might be gone, but nothing so definite that it would be unreasonable to think Diaz was home. Agents did not see Diaz on his property, but that was not surprising: Diaz had covered his windows with blankets, and the dogs and surveillance cameras prevented the agents from safely and unobtrusively observing the property. No one answered the door when the agents knocked, but Diaz once had taken about 45 minutes to answer the door. Diaz's black SUV was not in view, but agents had previously encountered Diaz at the house without seeing his car, so its absence did not mean Diaz was not at home. In fact, agents later found the SUV in a nearby shed. A red SUV drove away from the house while the agents watched, but they did not recognize the SUV. Furthermore, they only saw one unidentified person in the SUV, and they had seen two people in front of Diaz's house. They assumed that one person remained, and they assumed that it was Diaz. It is hard to blame the agents for not stopping the car: They believed Diaz was still in his house, and they knew Diaz received frequent visitors during the day.

[7] Diaz also argues that reasonable belief cannot exist unless the government has some specific evidence that the suspect is present at the particular times that officers come to arrest him. We disagree with that proposition, as well. People draw "reasonable" conclusions all the time without direct evi-

dence. Indeed, juries frequently convict defendants of crimes on circumstantial evidence alone. *See, e.g.*, *United States v. Yoshida*, 303 F.3d 1145, 1151 (9th Cir. 2002) ("[C]ircumstantial evidence can form a sufficient basis for conviction.") Likewise, a probable cause determination can be supported entirely by circumstantial evidence. *See, e.g.*, *United States v. Spearman*, 532 F.2d 132 (9th Cir. 1976) (circumstantial evidence may justify search warrant). If juries can find someone guilty beyond a reasonable doubt without direct evidence, and magistrates can issue search warrants without direct evidence, police surely can reasonably believe someone is home without direct evidence.

III.   Conclusion

[8] We conclude that the district court did not err in denying Diaz's motion to suppress the evidence that government agents discovered in his home. The district court found, under the totality of the circumstances, that the agents had reason to believe Diaz was home when they went to arrest him. That finding was not erroneous. The officers had reliable information that Diaz was usually at home during the day. Nothing the agents observed made this belief unreasonable. Because the agents had sufficient reason to believe Diaz was home and entered pursuant to a valid arrest warrant, they did not violate Diaz's constitutional rights.

   **AFFIRMED.**